IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

EVA L.,                                    )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )        Civil Action No. 1:20cv0162 (JFA)
                                           )
ANDREW SAUL,                               )
Commissioner of Social Security,           )
                                           )
                    Defendant.             )
_____)

## MEMORANDUM OPINION AND ORDER

This matter is before the court on cross-motions for summary judgment. (Docket nos. 20,

23). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of

Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying

plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") under the Social Security Act. The Commissioner's final decision is based on a finding

by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Disability

Adjudication and Review ("Appeals Council") that plaintiff was not disabled as defined by the

Social Security Act and applicable regulations.[1]

On July 23, 2020, plaintiff filed a motion for summary judgment (Docket no. 20), a

memorandum in support (Docket no. 21), and a waiver of hearing (Docket no. 22). Thereafter,

the Commissioner submitted a cross-motion for summary judgment (Docket no. 23), a

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to
Local Civil Rules 5 and 7(C). (Docket no. 11). In accordance with those rules, this
memorandum opinion excludes any personal identifiers such as plaintiff's social security number
and date of birth (except for the year of birth), and the discussion of plaintiff's medical
information is limited to the extent necessary to analyze the case.

memorandum in support (Docket no. 24), a memorandum in opposition (Docket no. 25), and a waiver of hearing (Docket no. 26).[2]

For the reasons set forth below, plaintiff's motion for summary judgment (Docket no. 20) is granted in part; the Commissioner's motion for summary judgment (Docket no. 23) is denied; and the final decision of the Commissioner is remanded for further consideration.

## I. PROCEDURAL BACKGROUND

On December 2, 2016, plaintiff applied for DIB and SSI with an alleged onset date of July 26, 2016. (AR 302–03, 306–10). The Social Security Administration ("SSA") initially denied plaintiff's applications on December 29, 2016. (AR 175–87, 190–202). Plaintiff requested reconsideration of the denials on February 7, 2017 (AR 261–62) which the SSA denied on April 11, 2017 (AR 221–36, 238–53).[3] Subsequently, on May 9, 2017, plaintiff requested a hearing before an ALJ. (AR 273–74). The Office of Disability Adjudication and Review acknowledged receipt of plaintiff's request on June 7, 2017 (AR 275–77) and later scheduled a hearing before an ALJ on December 4, 2018 (AR 297). Plaintiff signed an "Appointment of Representative" form on June 16, 2017 authorizing Robert F. Kiel to represent her with respect to her claims, but on November 22, 2017, Mr. Kiel withdrew as plaintiff's attorney (AR 290–93).

On December 4, 2018, ALJ Raghav Kovtal held a video hearing in Washington, D.C. (AR 17).[4] Plaintiff appeared in Falls Church, Virginia, and was not represented. (*Id.*). Plaintiff

---

[2] Plaintiff was provided the opportunity to file a reply to the Commissioner's cross-motion for summary judgment in the court's briefing order (Docket no. 13) but has chosen not to do so.

[3] The ALJ's decision notes the SSA's denial of plaintiff's request for reconsideration pertaining to her DIB and SSI claims as April 17, 2017. (AR 17). A review of the administrative record shows the date of denial as April 11, 2017. (*See* AR 236, 253).

[4] The hearing transcript notes the date of the hearing before ALJ Kovtal as December 14, 2018. (*See* AR 83, 85).

provided testimony and answered questions posed by the ALJ. (AR 85–134, 140–41, 146–52). A vocational expert also answered questions from the ALJ and plaintiff. (AR 134–40, 141–46, 149–50). On January 31, 2019, the ALJ issued his decision finding that plaintiff was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act from July 26, 2016 through the date of his decision. (AR 17–29). On February 27, 2019, plaintiff signed an "Appointment of Representative" form authorizing Lindsay F. Osterhout to represent her with respect to her claims. (AR 12–13). Ms. Osterhout submitted plaintiff's request for review with the Appeals Council in a letter dated February 27, 2019. (AR 460–61). The Appeals Council denied the request on December 19, 2019, finding no reason under its rules to review the ALJ's decision. (AR 1–3). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 1). *See* 20 C.F.R. §§ 404.981, 416.1481. Plaintiff was given sixty (60) days to file a civil action challenging the decision. (AR 2).

On February 14, 2020, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On June 22, 2020, the court entered an order setting the briefing schedule for the parties' cross-motions on summary judgment. (Docket no. 13). Thereafter, the parties agreed to refer this matter to the undersigned magistrate judge for resolution. (Docket nos. 15, 18). On July 8, 2020, the parties filed a joint motion to amend the briefing schedule, which the court granted on the same day. (Docket nos. 17, 19). Plaintiff filed her motion for summary judgment on July 23, 2020. (Docket no. 20). The Commissioner filed his opposition and cross-motion for summary judgment on August 24, 2020. (Docket nos. 23–25). The parties waived oral argument on their motions. (Docket nos. 22, 26). This case is now before the court on the parties' cross-motions for summary judgment. (Docket nos. 20, 23).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1979)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (internal quotations and citations omitted). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty to resolve evidentiary conflicts, not the reviewing court, and the ALJ's decision must be sustained if supported by substantial evidence. *Smith v. Chater*, 99 F. 3d 635, 638 (4th Cir. 1996).

## III. FACTUAL BACKGROUND

### A.   Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1956 and was sixty-two years old at the time of the ALJ hearing on December 4, 2018. (AR 93, 302). She has one or two years of college education. (AR 93, 359). From 2002 to 2003, plaintiff worked as a legal secretary for Greenberg Taurig, LLP. (AR 316, 359). From 2004 to 2006, she was self-employed as a real estate agent. (AR 94–95, 316). During 2005, plaintiff also engaged in temporary assignments to include work as a legal secretary for Ruden McClosky and Legal Search Solutions, Inc. (AR 96, 316). From 2006 to

4

2008, plaintiff returned to legal secretary work at Shutts & Bowen, LLP. (AR 316–17). At the end of 2008, plaintiff was self-employed. (AR 317). In 2009, she returned to Shutts & Bowen, LLP before moving to Virginia and beginning employment at Williams Mullen Clark & Dobbins PC. (AR 317). In 2010, plaintiff continued working for Williams Mullen but also engaged in employment at Collections by Jane, Ltd., Geologics Corporation, Chicos, and Wells Fargo Bank. (*Id.*). In 2011, plaintiff worked for Metropolitan Life Insurance Company, TS Employment, Inc., Geologics Corporation, and Nordstrom Inc & Subsidiaries. (AR 318).[5] She also continued to work on a commission basis as a real estate agent. (AR 102–03). Plaintiff then moved to part-time employment as a legal secretary at BAC Florida Bank from 2014 to 2016 alongside working as a sales clerk at L'Occitane, Inc., beginning in 2015. (AR 318–19, 323–24, 447). She continued her employment at L'Occitane into 2017. (AR 319). During the same year, plaintiff also worked for Alta IT Services LLC as a customer representative and ADP TotalSource Company as a sales representative. (AR 319, 428–29). In 2018, plaintiff worked part-time at L'Occitane and Sephora, USA, Inc. (AR 331, 458).

**B.       Summary of Plaintiff's Medical History Prior to Alleged Date of Disability[6]**

On August 25, 2015, plaintiff reported to Ivan G. Carrasquilla, M.D., at Primecare of Coral Gables presenting with panic attacks, weight gain, and fatigue. (AR 573–74). She was experiencing fatigue, excessive sweating, hot flashes, and palpitations. (AR 573). Dr. Carrasquilla performed a general examination and found plaintiff to be in no acute distress. (*Id.*).

---

[5] The detailed earnings query does not reflect any earnings for 2012 or 2013. (AR 318).

[6] The AR contains over 450 pages of medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to her claims and is not intended to be an exhaustive list of every medical treatment.

She was well-developed and well-nourished. (*Id.*). He assessed plaintiff with anxiety and depression, heart palpitations, and an abnormal finding on her EKG examination, so referred her to cardiology. (AR 574).[7] Dr. Carrasquilla also re-started plaintiff on fifty milligrams of Zoloft and began her on Alprazolam to be taken as needed for her panic attacks. (*Id.*). She was to follow up in four weeks. (*Id.*).[8]

Following complaints of a "shadow/curtain" in the upper visual field of her right eye beginning on August 26, 2015, plaintiff was seen by Neda Nikpoor, M.D., on August 27, 2015 at the University of Miami. (AR 480–83). Plaintiff explained that she was on the second day of taking Xanax and felt that this could be associated with her loss of vision, although two weeks ago she had noticed "many floaters." (AR 481). She did not have a history of retinal detachment although her brother did. (*Id.*). Dr. Nikpoor performed a basic eye examination to include a fundus exam, a slit lamp exam, a tonometry test, and a review of her pupils, dilation, and visual acuity. (AR 482). Plaintiff had macular off-right retinal detachment, myopia, and a horseshoe tear. (AR 483). Dr. Nikpoor advised plaintiff she would need surgery either the following day or the following Monday; plaintiff preferred to wait until Monday and was to have the procedure performed by William E. Smiddy, M.D. (*Id.*). Plaintiff was sent for a pre-operative examination given her history of an abnormal echocardiogram. (*Id.*).

Later the same day, plaintiff saw Aldo Pavon Canseco, M.D., for the pre-operative examination. (AR 478–80). A review of her systems resulted in largely normal findings,

---

[7] Plaintiff underwent an EKG on September 15, 2015 further to Dr. Carrasquilla's referral. (AR 559–60). A Doppler study with pulsed, continuous wave and color flow evaluation was performed and resulted in normal findings, although plaintiff was considered "borderline" for diastolic dysfunction. (*Id.*).

[8] The AR does not contain a record to show if a follow up appointment occurred.

although her eyes were positive for visual disturbances, she exhibited some sleep disturbances, and also had arthralgias. (AR 479–80). A physical examination also demonstrated normal findings; plaintiff was oriented to person, place, and time, appeared well-developed and well-nourished, and had normal mood, affect, and judgment. (AR 480). She was considered in "optimal medical condition" for surgery. (*Id.*).

On August 31, 2015, plaintiff saw Dr. Smiddy for a scleral buckling procedure for right retinal detachment. (AR 467–68). Following the procedure, the retina was "virtually completely attached," plaintiff was given a subconjunctival injection of Garamycin and Decadron and, after Maxitrol and Atropine, her eye was patched, and she was returned to her hospital room. (AR 468). The next day, Dr. Smiddy saw plaintiff and found no unusual circumstances or complications. (AR 466). There was a large break in her attached retina at "11:30" and a smaller one at "10:30," but Dr. Smiddy did not see any inferior breaks despite looking very carefully. (*Id.*). Dr. Smiddy checked plaintiff's uncorrected distance visual acuity, uncorrected near visual acuity, and intraocular pressure in her right eye. (*Id.*). He noted there was only some mild inflammation in the anterior segment, but no posterior segment complications. (*Id.*). Plaintiff was to begin Maxitrol drops four times daily and told to keep her face in a down position for a week. (AR 467). She had been informed of how to take care of her eye and was to return sooner than her scheduled appointment if the pain increased or she experienced a sudden loss of vision. (*Id.*).

Dr. Smiddy saw plaintiff on September 3, 2015 and noted that her retinal detachment was flat after the procedure. (AR 466). She was to finish the Maxitrol drops, continue to use prednisolone acetate, and return for a follow up visit in two weeks. (*Id.*). On September 18, 2015, plaintiff attended her scheduled visit where Dr. Smiddy checked the uncorrected distance

visual acuity and intraocular pressure in her right eye. (*Id*). Her retina was attached and posterior to the scleral buckle. (*Id*.). Plaintiff was to return in three weeks and again continue using the Maxitrol drops and the prednisolone acetate. (*Id*.).

Plaintiff reported to Merja Clegg, M.D., on October 5, 2015 with complaints of having to frequently urinate over the previous three days. (AR 571–72). Dr. Clegg assessed plaintiff with acute cystitis following a "strongly positive" urinalysis and prescribed Cipro. (*Id*.). She also assessed plaintiff with bilateral hand pain and referred her to occupational therapy for an evaluation and treatment twice a week for four weeks or as needed. (AR 571–72). Plaintiff was also referred to gastroenterology for a screening colonoscopy. (AR 572).

On October 13, 2015, Dr. Smiddy saw plaintiff and noted that her retina was now "attached completely." (AR 465). He tested plaintiff's corrected visual acuity and intraocular pressure in both eyes. (*Id*.). He noted that plaintiff's macula was off but her visual acuity improvement had now stagnated. (*Id*.). She was to continue tapering off all drops and follow up in two months for a potential pinhole acuity test and refraction test. (*Id*.). Plaintiff's follow-up appointment occurred on December 8, 2015. (*Id*.). Her right retina was completely attached but Dr. Smiddy did note that the difference between her corrected distance visual acuity in her right eye compared to her left eye was likely due to a cataract. (*Id*.). To that end, he referred plaintiff for a consultative examination. (*Id*.).

Plaintiff presented with a cold on December 22, 2015 and was seen by Dr. Clegg. (AR 569–70). She had no fever or chills but, for the previous four days, had felt tired and congested. (AR 569). Plaintiff was also worried about a facial rash which was not healing. (*Id*.). Dr. Clegg prescribed plaintiff Tessalon Perles for her cough and referred her to dermatology for the rash and hemorrhagic cysts on her face. (*Id*.). However, at plaintiff's next appointment on March 10,

2016, plaintiff was still concerned about the skin lesions on her face. (AR 567–68). She also reported tiredness, swollen hands and fingers, and lower back pain. (AR 567). Plaintiff had been tested for rheumatoid arthritis in the past, but the results had come back negative; Lupus and Sjogren had also been ruled out. (*Id.*). Despite this, plaintiff's hands were aching all the time. (*Id.*). Dr. Clegg referred plaintiff to an educator for her facial rash with the rationale that she needed a referral to the University of Miami's dermatology department. (AR 568). For plaintiff's bilateral hand pain, Dr. Clegg noted that plaintiff exhibited "classic" osteoarthritis signs on her hands, so prescribed Mobic as needed for the pain, Tylenol for the arthritis, and referred her to a hand specialist in orthopedic surgery. (*Id.*).

From January 20, 2016 to May 4, 2016, plaintiff was treated at Aran Eye Associates. (AR 508–39). At her first appointment, she reported to Jessica Rodriquez, O.D., with blurry vision in her right eye which had started about six months before and was progressive. (AR 535). A review of plaintiff's systems resulted in normal findings and she was oriented to person, place, and time with a normal mood and affect. (AR 536–37). Plaintiff's visual acuity and glasses prescription were reviewed. (AR 536). An examination of her eyes, a slit lamp examination, and a fundus examination also resulted in normal findings. (AR 537–38). Dr. Rodriquez diagnosed plaintiff with an age-related cataract and referred her for further evaluation. (AR 538). She also diagnosed plaintiff with posterior vitreous degeneration in her right eye which accounted for plaintiff's complaints. (*Id.*). Dr. Rodriquez noted that there was no evidence of retinal pathology and discussed with plaintiff all the signs and risks of retinal detachment and tears. (*Id.*). Plaintiff was to immediately follow up if she noted any of these symptoms. (*Id.*). Finally, Dr. Rodriquez assessed plaintiff as having "other retinal detachments" which she discussed with plaintiff. (AR 538–39).

On February 8, 2016, plaintiff saw Raul Masvidal, M.D., for her blurry vision and an evaluation of the retinal detachment in her right eye following the scleral buckling procedure performed in August 2015. (AR 527–32). Dr. Masvidal noted plaintiff's visual acuity as "impressive" after having waited so long—approximately two weeks after she started seeing floaters—before undergoing the repair surgery. (AR 530). To that end, he further discussed with plaintiff the signs and symptoms of floaters in connection with the vitreous degeneration in her right eye. (*Id.*). Plaintiff's age-related cataract was considered "incipient" and "not significant to operate" on at the time, but if plaintiff felt any change in vision, she was to visit the office sooner rather than later. (*Id.*).

Dr. Masvidal saw plaintiff on February 23, 2016 following her complaint of a "foreign body sensation" in her right eye which had started approximately one week before her appointment. (AR 522–25). Dr. Masvidal and plaintiff discussed the signs and symptoms of posterior vitreous detachment/floaters as well as plaintiff's cataract which, Dr. Masvidal explained, accounted for her complaint. (AR 525). She was to monitor her vision for changes and contact the office if any decrease in her vision occurred. (*Id.*). Dr. Masvidal informed plaintiff that her dry eyes could not be cured, but instead treated and maintained with artificial tears. (*Id.*).

On March 19, 2016, plaintiff saw Isis Rodriquez, O.D., at Lolys Optical for an examination following her complaint of blurred vision. (AR 488–89, 492). Plaintiff reported that she had been experiencing this problem, moderate in severity, all day for several years. (AR 488). She drove but with some difficulty. (*Id.*). Dr. Rodriquez diagnosed plaintiff with myopia in the left eye, bilateral regular astigmatism, presbyopia, unspecific ptosis of the right eyelid, and unspecified retinal detachment with retinal break in the right eye. (AR 489). Dr. Rodriquez

10

referred plaintiff to an ophthalmologist for further evaluation and treatment of the ptosis and retinal detachment. (*Id.*).

Mae Gutierrez, M.D., saw plaintiff on March 21, 2016 regarding the itchy, painful, and moderately severe rash on plaintiff's face. (AR 578). Dr. Gutierrez performed an examination of plaintiff's head, to include her face, eyelids, and lips, as well as her neck, chest, abdomen, back, right upper extremity, and left upper extremity. (*Id.*). Plaintiff was well-developed, well-groomed, and well-nourished, alert and oriented to person, place, and time, with a pleasant mood and affect. (*Id.*). Dr. Gutierrez noted four impressions following the examination, the first of which was acne on plaintiff's face and neck. (*Id.*). She prescribed plaintiff with Aczone, a topical gel, and Morgidox. (*Id.*). Plaintiff also had lentigines—reticulated light tan macules on her face, hand, trunk, and arms—and benign nevi—regular, symmetrical, evenly-colored macules and papules with symmetrical and uniform reticular pattern on her trunk and arms—for which Dr. Gutierrez provided educational brochures offering further advice on sun damage and moles. (*Id.*). Finally, plaintiff was assessed as having "cherry angiomas" on her trunk; Dr. Gutierrez counseled the patient that she could have these resolved with laser treatment or electrodesiccation, but that they were benign vascular growths for which no treatment was necessary. (*Id.*).

At plaintiff's next appointment with Dr. Masvidal on April 11, 2016, she was assessed with the same conditions as those at her last appointment: floaters, cataracts, and dry eyes. (AR 517–21). Dr. Masvidal noted that plaintiff did not understand that her visual acuity was secondary to retinal detachment as her cataract was incipient; instead, she wanted to follow up with Dr. Smiddy after a consultation with the retina group of the office. (AR 520). She did not

understand that her macula was compromised and that any cataract surgery would not be beneficial. (*Id.*). Plaintiff was directed to follow up in one month with the retina clinic. (*Id.*).

On April 26, 2016, plaintiff had a further evaluation of her facial rash with Susana Leal-Khouri, M.D. (AR 583). An examination was performed, and plaintiff was found to have acne on the right inferior central malar cheek. (*Id.*). Plaintiff was to continue applying Aczone to treat her acne and was also recommended to use over-the-counter clarifying soap and acne spot treatment. (*Id.*). She was also prescribed Spironolactone. (*Id.*). Plaintiff was assessed as having ill-defined hyperpigmented patches located on her face which Dr. Leal-Khouri recommended be treated with an over-the-counter pigment regulator. (*Id.*). Finally, plaintiff had an inflammatory papule on her face which Dr. Leal-Khourri treated with an injection of Kenalog. (*Id.*).

The following day, on April 27, 2016, plaintiff was seen at the Banyan Community Health Center for a bio psychosocial assessment. (AR 496–504). She reported feeling overwhelmed and anxious and had been feeling stressed out for about two years, mainly because she took "care of everything at home." (AR 498). She sought emotional stability and the resolution of her financial difficulties and wanted to receive therapy. (*Id.*). She reported that she was able to work hard and had a good capability to perform her duties in her job. (*Id.*). Plaintiff reported experiencing significant depression and serious anxiety over the previous thirty days and during her life. (*Id.*). She had also experienced trouble understanding, concentrating, or remembering in the past thirty days. (*Id.*). During her lifetime, plaintiff experienced trouble controlling violent behaviors. (*Id.*). She had been seen once by a psychiatrist. (*Id.*). Plaintiff did not have a history of suicide nor a history of substance abuse. (AR 499). She had been sober for twenty-one years. (*Id.*). Plaintiff reported that she had a gambling problem and that, due to her anxiety, she had experienced problems in her relationship. (AR 500). At the time of her

12

assessment, plaintiff was living with her mother and her son who she identified as the most important people in her life. (*Id.*). She admired her mother "due to all the virtues she has," describing her as lovely and reporting that she felt close to her mother at home and safe. (AR 501). Her son, however, caused her too much stress as his maladaptive behavior was the source of many dysfunctional family problems. (*Id.*). Plaintiff was dressed casually with normal grooming and hygiene, was calm and cooperative with "functioning" behavior. (*Id.*). Her speech was fast in rhythm and high in volume with pressure, her affect depressed and flat, and her mood anxious. (*Id.*). Her thought processes were goal directed and logical and she did not have any suicidal or homicidal ideations. (AR 502). Plaintiff's short term memory and concentration were intact but her long term memory and concentration were noted as distractible/inattentive. (*Id.*). Her judgment and insight were poor. (*Id.*). Plaintiff was described as being in an "acute, stressful situation" due to many life difficulties she faced, including her family problems, gambling, and divorce. (*Id.*). Plaintiff's treatment consisted of a weekly hour of individual therapy for six months to address her depression and anxiety symptoms and a pharmacological management appointment once a month for twelve months to address her depression. (AR 503).

Plaintiff saw Kin Yee, M.D., for an evaluation of her retina in her right eye on May 4, 2016. (AR 508–12). In addition to plaintiff's previous assessment of vitreous degeneration in her right eye and an age-related cataract, Dr. Yee also assessed plaintiff with retinal detachment with a retinal break of the right eye. (AR 511). Dr. Yee noted that plaintiff's macula was "off," she had a horseshoe tear at "11:00," and that she had undergone a scleral buckling procedure with Dr. Smiddy which resulted in a 360 degree retina attachment. (*Id.*). Dr. Yee informed plaintiff of retinal detachment precautions. (*Id.*).

13

Rosalind Guest, A.R.N.P., saw plaintiff on June 30, 2016 for a physical examination and PAP smear. (AR 564–65). Plaintiff had been started back on Simvastatin for her hyperlipidemia and was tolerating it well; she was also taking Mobic as needed for the arthritis in her hands. (AR 564). She reported that she had recently had very low energy levels and that a lot of stress at work was dragging her down. (*Id.*). This was in addition to caring for her elderly mother. (*Id.*). Plaintiff was to continue taking Simvastatin as prescribed and to have a recheck of her lipid panel sometime during the following month. (AR 565). Ms. Guest also recommended plaintiff see a therapist to discuss her stress and anxiety issues which were contributing to her fatigue. (*Id.*). For plaintiff's depression, her dose of Sertraline was increased to fifty milligrams daily and she was recommended to increase the frequency of exercise. (*Id.*). Ms. Guest also provided plaintiff with referral information for counseling. (*Id.*).

### C.   Summary of Plaintiff's Medical History Following Her Alleged Disability Date (July 26, 2016)

On July 29, 2016, plaintiff saw Ms. Guest and noted that her job would be ending soon. (AR 562). A repeat PAP smear was performed, and plaintiff continued to use Mobic as needed for her hand pain. (AR 563). Plaintiff returned to see Dr. Leal-Khouri on August 17, 2016 for further evaluation and management of her facial rash. (AR 586). Plaintiff was to continue to treat her acne with Aczone, but her dose of Spironolactone was modified to a lower milligram amount. (*Id.*). Dr. Leal-Khouri also assessed plaintiff as having in-linear configuration and hemorrhagic crust distributed on the face and prescribed Zithromax to take and samples of Neosynalar cream. (*Id.*).

On September 25, 2016, plaintiff presented to the Emergency Department at Memorial Hospital West complaining of flank pain; specifically, left lower back pain that radiated into her left lower quadrant. (AR 594). She had experienced this pain for approximately three days but

had only reported to the emergency room now following an increase in the severity of her symptoms, to include feeling nauseous while she was at the mall. (AR 594, 601, 622). Plaintiff compared her symptoms to that of menstrual "bloating and cramping." (AR 594). A review of plaintiff's symptoms resulted in largely negative findings except for her left lower back pain, and a physical examination did not show anything problematic. (AR 595, 597–98). Plaintiff was alert and oriented to person, place, and time with a normal mood and affect. (AR 598). A radiology exam showed plaintiff had "mild hydronephrosis secondary to an obstructing 3 mm stone in the left proximal ureter" with a "separate non-obstructing renal stone on the left." (AR 599, 607). Plaintiff was advised of a treatment plan for her kidney stones and provided an outpatient follow-up appointment. (AR 599). She was discharged in "good condition" with a prescription for Ibuprofen and Levofloxacin. (AR 600).

Later the same day, and following her discharge from Memorial Hospital West, plaintiff arrived at Palmetto General Hospital again presenting with flank pain. (AR 631). She explained that as she had been driving home from Memorial Hospital West, her symptoms persisted, that she was unable to make it to the pharmacy on time, and that she required immediate pain relief. (AR 637, 645). She stated that her pain was at about ten out of ten. (AR 645). Her symptoms were alleviated by nothing but aggravated by palpitation and percussion. (AR 637). A physical exam resulted in normal findings except plaintiff's abdomen exhibited tenderness to deep palpation of the left lower quadrant. (AR 652). Following discussion with plaintiff concerning her abdominal pain, her primary care physician was contacted concerning admission, and plaintiff was later admitted to the hospital and given IV fluids. (AR 633–34, 640–41). She was given Flomax which improved her symptoms significantly and Toradol for the pain. (AR 645, 649). Plaintiff had a CT scan taken of her abdomen and pelvis which again showed the presence

15

of a small stone in her left kidney. (AR 657). The stone was proximal to the left ureter therefore causing mild hydronephrosis. (*Id.*). Plaintiff was discharged with minimal pain and in a stable condition; her diagnosis remained nephrolithiasis, but the pain was now three out of ten. (AR 645–46). She was to follow up with her primary care provider, continue taking the medication prescribed by Memorial Hospital West, and take the Flomax prescription provided from this visit. (*Id.*).

  As part of the treatment plan for her adjustment disorder with mixed anxiety, plaintiff underwent a psychiatric evaluation on November 7, 2016 at Miami Behavioral Health Center. (AR 708, 716–20). She was seen by Sandra J. Fujita, A.R.N.P., L.C.S.W. (AR 720). Plaintiff's chief complaint was that she was depressed, full of rage, and agitated, that she was negative, and that she was not sleeping or working. (AR 716). She explained to Ms. Fujita that sometimes she felt "like giving up" and that she had lost her job as a legal secretary "again," when the attorney she was working for retired and was now working for $12.00 an hour which she resented. (*Id.*). Plaintiff had received past psychiatric help in the form of psychotherapy following her divorce. (*Id.*). She did not have any previous suicide or homicide attempts nor a history of other violent behavior. (*Id.*). Plaintiff also did not have a history of alcohol or substance use. (*Id.*). A review of plaintiff's medical history highlighted that she had high cholesterol, arthritis, allergies, kidney/urinary tract disorder, and osteoarthritis. (AR 717). Moving to plaintiff's social and familial history, Ms. Fujita noted that two of plaintiff's sons lived in Virginia, one of whom identified as gay, which plaintiff found very hard at the time. (*Id.*). However, plaintiff considered her "supportive family" one of her personal strengths and assets. (*Id.*). Ms. Fujita's mental status examination described plaintiff as oriented to time, person, and place, with an appropriate appearance and affect, alert sensorium, unremarkable speech, and a cooperative

general attitude. (AR 718). Plaintiff's mood, however, was depressed and anxious and she showed poor insight, judgment, sleep, and appetite. (*Id.*). Her thought process and content were unremarkable, and her concentration/attention span was poor. (*Id.*). In summary, Ms. Fujita noted plaintiff was very negative, angry, and resentful of life. (*Id.*). She had a "moderate" level of functioning but needed medication to stabilize, control, and maintain her symptoms. (AR 719). Plaintiff's behavioral changes were moderately impacting her functioning and her activities of daily living were considered moderately impaired. (*Id.*).

The following month, on December 7, 2016, plaintiff saw Ms. Fujita for her follow-up appointment and identified the problems she wanted to address in treatment; namely, to reduce the symptoms associated with her anxiety, depression, poor insight, sleep, and judgment, and to reduce her auditory and visual hallucinations and paranoid delusions. (AR 709). Specifically, plaintiff noted that she wanted to "increase her coping skills to deal with familial/social stressors and mental health symptoms in more healthy ways." (*Id.*). She was "depressed and full of rage," but did not want to feel this way anymore and, with this, wanted both the hallucinations and delusions to also stop. (AR 710). Ms. Fujita recommended plaintiff receive medication management treatment from December 7, 2016 onward, once a month for the next six months with a "target" date of June 7, 2017. (*Id.*). Ms. Fujita noted that plaintiff was "somewhat slow at work" but that she was less irritable. (AR 714). Her appearance was disheveled, her affect appropriate, and her mood anxious. (*Id.*). She was oriented to time, place, and person, with alert sensorium, immediate memory, and unremarkable speech. (*Id.*). Plaintiff's speech, appetite, eye contact, reliability, concentration, insight, and judgment were all "fair," and she had intact thought processes with unremarkable thought content. (*Id.*). At the time, plaintiff denied hallucinations and delusions and did not have any suicidal or homicidal thoughts, intent, or plan.

17

(*Id.*).  Ms. Fujita found plaintiff was "not improving as expected" and found plaintiff "suffer[ed]

from a chronic, debilitating mental illness . . . [and] . . . anticipated that [plaintiff would] require

a lifetime of regular care to manage [her] highest practical level of functioning." (AR 715).

Plaintiff's medication regimen was found to be effective in the reduction of symptoms, although

she did report minimal side effects. (*Id.*).  Ms. Fujita found neither improvement nor

deterioration in plaintiff's behavior or her activities of daily living as a result of the psychiatric

intervention. (*Id.*).

  The only medical notes in the record during 2017 are a range of motion report form and a

report from a disability evaluation by Roland Kaplan, D.O., at Broward Spine Institute dated

April 10, 2017. (AR 699–705).  As shown in the range of motion report, Mr. Thigpen found all

of plaintiff's motion measurements—to include her cervical spine, lumbar spine, shoulder,

elbow, wrist, hand, hip, knee, ankle, and great toe—all within normal limits. (AR 699–701).

Mr. Kaplan noted plaintiff had a history of osteoarthritis in both hands, although greater on the

right than the left, which had begun between eight to ten years previously. (AR 704).  On her

right side, plaintiff had also had carpal tunnel surgery. (*Id.*).  In 2011, plaintiff was in a motor

vehicle accident which caused injury to her right rotator cuff which required surgery. (*Id.*).

Plaintiff informed Mr. Kaplan that she suffered from cervical decompression and some left

lumbar pain. (*Id.*).  Plaintiff reported that she previously worked as a legal secretary and that her

ability to type had diminished. (*Id.*).  Mr. Kaplan reviewed plaintiff's past medical history, past

surgical history, medications, allergies, and family history. (*Id.*).  He also reviewed plaintiff's

systems which he found "significant for fatigue, nausea, and diarrhea [but] otherwise

noncontributory." (*Id.*).  Following a physical exam, Mr. Kaplan noted that plaintiff ambulated

with a "nonantalgic gait." (*Id.*).  Her heel and toe walking were grossly intact, and she was able

to stoop and stand from a stooped position. (*Id.*). Mr. Kaplan found plaintiff's motor strength was "grossly five minus over five," her sensation grossly intact, and her deep tendon reflexes normoactive with no pathological reflexes appreciated. (*Id.*). She had a good grip with intact range of motion in her wrists, elbows, and shoulders. (*Id.*). Her tinel sign was negative bilaterally and her range of motion in her cervical spine was grossly within functional limits. (*Id.*). Mr. Kaplan further noted plaintiff's fine motor coordination was within functional limits and her modified straight leg raise was negative bilaterally. (*Id.*). He assessed plaintiff with carpal tunnel syndrome by history and noted that the joint spaces in her hands were intact and no fractures or dislocations were appreciated. (*Id.*).

By 2018 plaintiff had relocated to Virginia and was receiving treatment through Kaiser Permanente ("Kaiser") in Northern Virginia. (AR 36–82, 723–905). During an office visit with Dr. Sankara Mahesh on January 3, 2018, plaintiff was scheduled for cataract surgery on her right eye for April 3, 2018. (AR 730–34). Dr. Lee performed a routine health checkup exam on January 5, 2018 and noted osteoporosis and osteoarthritis. (AR 744–45). Plaintiff visited internal medicine on February 7, 2018 complaining of right shoulder pain following a right rotator cuff repair. (AR 895). She could not sleep on her right side and was very limited in terms of range of motion in all directions. (*Id.*). Plaintiff reported that the pain could reach ten out of ten the further she moved the shoulder and that her symptoms had worsened over the previous few months. (*Id.*). The pain hindered her daily functioning. (*Id.*). To that end, plaintiff underwent an x-ray on her shoulder which showed mild degenerative changes of the acromial clavicular joint but no acute displaced fracture or dislocation. (AR 896). Plaintiff's glenohumeral joint appeared "grossly preserved" with insignificant joint space narrowing or productive bony change. (*Id.*).

19

On February 8, 2018, plaintiff was seen by Dr. Cates in orthopedics for her right shoulder pain and was scheduled for an MRI. (AR 748–51). Plaintiff had an MRI on her right shoulder and the scan showed a "possible, tiny low-grade interstitial tearing at the central cuff enthesis" and a small "SLAP tear." (AR 885–86). There was also minimal osteoarthrosis of the acromioclavicular joint with a "trace" of subacromial/subdeltoid bursitis. (AR 886). Finally, the scan showed mild tendinopathy in plaintiff's intra-articular biceps. (*Id.*). On March 2, 2018, Dr. Cates informed plaintiff that her MRI revealed no rotator cuff tear and that mild arthritis and tendinitis/tendinosis was seen. (AR 790). She recommended that plaintiff continue taking Tylenol and Motrin for the pain along with exercise. (*Id.*).

On March 5, 2018, plaintiff sent a message to Dr. Lee that she was having constant pain in her hands/fingers and arm/shoulder and requested that he arrange for x-rays of her hands. (AR 792–93). Later that day Dr. Lee informed plaintiff that he would place an order for the hand x-rays. (AR 792). On March 6, 2018, plaintiff visited urgent care complaining of chest pain and rotator cuff strain. (AR 870). She underwent a chest x-ray which showed that her lungs were clear and that there was no pneumothorax or pleural effusion. (AR 869). Her cardiomediastinal silhouette was within normal limits and there was minimal thoracic scoliosis. (*Id.*). She had no acute cardiopulmonary process. (*Id.*). Subsequently, she was discharged and advised to follow up with her primary care physician, Hansel Lee, M.D. (AR 870).

Plaintiff presented for a follow-up appointment with Dr. Lee on March 13, 2018 after reporting to urgent care with arm pain. (AR 863–68). She continued to have significant pain and decreased range of motion and functioning and also reported that, in her right hand, she had noticed numbness and tingling associated with a shooting pain. (AR 866). She explained that her OBGYN physician had sent her for a Dual Energy X-ray Absorptiometry scan and the

20

bilateral hand pain persisted. (*Id.*).[9]  Plaintiff felt that another steroid shot or physical therapy was required; she wanted to keep moving forward with treatment to relieve her symptoms "as they significantly impeded her ability to work and function comfortably." (*Id.*).  A review of plaintiff's symptoms and a physical examination resulted in largely normal findings, except plaintiff demonstrated moderate tension and tender to palpitation points along her posterior right neck and trapezius. (*Id.*).  Dr. Lee prescribed plaintiff with Gabapentin for the pain and encouraged plaintiff to continue massaging the area, using heat, and stretching to relieve not only her right shoulder but the surrounding muscles as well. (AR 867).  She could also continue taking Naproxen and schedule a follow-up appointment with orthopedics. (*Id.*).

On March 15, 2018, plaintiff wrote to Dr. Cates requesting physical therapy for her right shoulder pain which Dr. Cates approved. (AR 782–84).  Subsequent to this referral, Jyothi S. Varghese, a physical therapist, saw plaintiff on March 22, 2018 following her complaints of shoulder pain. (AR 857–60).  He was to teach plaintiff how to do exercises for the tendinosis and osteoarthritis in her right shoulder. (AR 858).  Plaintiff had the rotator cuff in her right shoulder repaired six years previously but, from January 2018, had gradually started experiencing shoulder pain again. (*Id.*).  The pain was worsening but had been manageable with Gabapentin to begin with. (*Id.*).  Plaintiff's symptoms increased with movement, lifting, and reaching, and were relieved by rest. (*Id.*).  At night, she experienced numbness and tingling in both hands which resulted in disturbed sleep. (*Id.*).  Due to the pain, plaintiff was limited in reaching up, behind or out; lifting overhead; sleeping on her right side; dressing; and self-care activities and, to that end, her goal was to decrease the pain and improve functioning. (AR 858–

---

[9] The bone density exam showed that plaintiff's bone density was slightly worse but similar to the results several years ago with osteoporosis in the lower spine and osteopenia (decreased bone density but not quite osteoporosis) in the hip. (AR 791).

59). Plaintiff had mild forward head posture and appeared to be in pain, with tenderness of the right acromioclavicular joint, right mid cervical facets, and right medial border of the scapula. (AR 859). Her glenohumeral mobility was good but she had decreased cervical segmental mobility. (*Id.*). A Spurling's test was positive for right shoulder pain and plaintiff had a painful arc with flexion. (*Id.*). The remainder of Mr. Varghese's examination was limited due to plaintiff's pain. (AR 860). Mr. Varghese proposed that plaintiff would benefit from physical therapy to decrease her pain, increase her strength, and increase her range of motion which, in turn, would improve her independence in functional mobility and functional strength. (*Id.*). Plaintiff was to have three physical therapy visits with possible interventions to include manual therapy, therapeutic exercise, patient education, neuromuscular re-education, functional activities, and modalities. (*Id.*). Plaintiff's goals were to be pain free with active range of motion in her right shoulder, to demonstrate independence and compliance with her home exercise program by the end of week one, and to report disabilities of the arm, shoulder, and hand as 40% or less. (*Id.*). Plaintiff was instructed to perform gentle stretching exercises to improve range of motion and prevent stiffness, avoid sustained overhead activities and overhead lifting, and use a heating pad 2–3 times a day to decrease pain and muscle tightness. (*Id.*).

Plaintiff had a second physical therapy visit on March 30, 2018 with Rachael Burnett, P.T.A. (AR 854–56). She reported some improvement since her previous appointment and that her medication was also helping. (AR 855). She was compliant with her home exercise program but found it painful to perform and still had sharp pain with certain activities of daily living. (*Id.*). Ms. Burnett performed a therapeutic examination, provided manual therapy, and applied heat. (*Id.*). She assessed plaintiff as continuing to have "high irritability" in her right shoulder and neck with limited active range of motion in most directions due to the pain. (AR 856). As a

22

result, plaintiff was guarded during manual therapy but did tolerate new stretches independently, albeit with minimal changes in her range of motion. (*Id.*).[10]

Plaintiff had cataract surgery on her right eye on April 3, 2018. (*See* AR 846–53). The following day, she attended an after-care appointment with Dr. Mahesh, who educated plaintiff and her family member on the expected course of treatment and the use of antibiotics and steroid drops. (AR 847). Plaintiff's wounds were well apposed and her pupils round. (*Id.*).

Following chronic pain in her right hand, plaintiff had an x-ray of her hands on May 11, 2018. (AR 843–44). She wanted to rule out whether the pain was acute, due to her osteoarthritis, or caused by some other etiology. (AR 843). Dr. Husain performed the x-rays and examination and found changes of inflammatory arthropathy involving the distal interphalangeal and carpometacarpal joints of multiple fingers in both hands. (AR 844). He also noted erosions on the "radial side of the distal aspects of the proximal phalanges on the right side." (*Id.*).

On the same day, Dr. Lee prepared a letter explaining how plaintiff's history of a retinal detachment, despite some vision improvement from surgery, impaired her nighttime vision making it unsafe for her to drive when it was dark outside. (AR 838). Dr. Lee also noted plaintiff's right rotator cuff in her shoulder which, in addition to osteoarthritis in her hands, made it difficult for her to lift heavier objects. (*Id.*). Referring to her employment, Dr. Lee indicated that plaintiff would benefit from not working a shift alone in the case of any potential flare-ups relating to her health issues. (*Id.*).

Beginning on May 30, 2018, plaintiff saw Lauree A. Ramsden, L.C.S.W., for a series of psychotherapy visits. (AR 828–34). At her first appointment, plaintiff reported that she had

---

[10] The AR does not appear to contain treatment notes pertaining to a third physical therapy visit as Mr. Varghese had recommended.

experienced some difficulty as a single parent which had contributed to the ongoing stress in her

adult life. (AR 829). She had been working up until the week prior to the appointment but had

left because she was unable to tolerate the level of stress. (*Id.*). She noted that her primary

stressors were "finances, family issues, unresolved feelings of anger, and personal relationships."

(*Id.*). Her goal was to feel in better emotional control. (*Id.*). Ms. Ramsden conducted a review

of symptoms and noted that plaintiff's depression symptoms were seen in loss of interest in

regular activities, decreased mood, insomnia, decreased energy, increased appetite, difficulty

concentrating or making decisions, and irritation. (*Id.*). Plaintiff's anxiety symptoms were seen

in excessive worry/not being able to control worry, trouble relaxing, worrying too much about

different things, feeling nervous or on edge, restlessness and agitation, feeling afraid that

something could happen, and irritability or easily annoyed. (*Id.*). Plaintiff did not exhibit

symptoms of mania or an eating disorder and showed no evidence of perceptual difficulties,

denying suicidal and homicidal ideations, auditory and visual hallucinations, PTSD-type

symptoms with flashbacks and dissociation, and paranoid or delusional thinking. (*Id.*). Ms.

Ramsden found plaintiff well-groomed, healthy, and appropriately dressed who was cooperative,

engaged easily, related well, and maintained eye contact. (AR 830). Plaintiff's demeanor,

speech, and concentration were normal and her thought process logical. (AR 831). Her mood

was anxious and her affect congruent with this. (*Id.*) She was able to provide a cogent history

and had intact recent and remote intellectual functioning and memory. (*Id.*). Plaintiff's impulse

control and insight were "average, adequate for this appointment," and her judgment good and

socially appropriate. (*Id.*). She reported that she was able to maintain basic activities of daily

living. (*Id.*). Ms. Ramsden found plaintiff to be at no significant risk to herself nor pose a

danger to others so was safe for treatment at the outpatient level. (AR 833). She was to begin

treatment by participating in individual and/or group therapy and to increase her self-care activities. (*Id.*). Plaintiff was also to maintain a personal routine, avoid the use of substances, keep her scheduled appointments, follow up with her psychiatry consultations as scheduled, and monitor her mood and behavior for any changes, such as the worsening of symptoms to include suicidal thoughts. (*Id.*). Plaintiff's goal was to "reduce the overall level, frequency, and intensity of the anxiety so that daily functioning is not impaired." (*Id.*). To that end, she was to identify cognitive strategies to reduce her anxiety and to identify beliefs and messages that produced her worry and anxiety. (*Id.*).

On June 4, 2018, plaintiff saw Todd Spencer Rankin, M.D., presenting with symptoms of depression and anxiety. (AR 824–27). She reported that she had struggled with both depression and anxiety since her divorce thirty-three years ago. (AR 824). Her symptoms included low energy, loss of interest in things, poor self-esteem, over eating, trouble concentrating, trouble falling asleep, racing heart, hot flashes, little patience, and easily irritable. (*Id.*). Plaintiff explained that she had been having panic attacks more recently which were often triggered by situations in which she needed to make a decision. (*Id.*). She felt like she was always worried about something and could never fully relax, needing to be in control. (*Id.*). Plaintiff also had some financial concerns which was one of the primary sources of her anxiety. (*Id.*). She had limited family or friends in the area in which she lived. (*Id.*). Plaintiff did not have self-harming behaviors, psychosis, or homicidal or suicidal ideations. (*Id.*). Dr. Rankin noted that plaintiff had been in and out of psychiatric treatment since her divorce, but she denied any psychiatric hospitalizations. (AR 825). He found plaintiff neatly dressed, clean, and cooperative with logical thought processes and thought content appropriate to interview. (AR 826). She had a slightly distressed appearing affect. (*Id.*). Her intellectual functions, memory, insight, and

25

judgment appeared normal. (*Id.*). Plaintiff was assessed as having major depressive disorder, recurrent, moderate, and started on Zoloft in order to achieve the goal of alleviating her symptoms. (*Id.*). She was to begin with twenty-five milligrams of Zoloft for one week before increasing her dosage to fifty milligrams. (*Id.*).

Ms. Ramsden saw plaintiff again on June 19, 2018. (AR 822–23). Plaintiff reported having seen some improvement in her sleep and a mild decrease in her anxiety symptoms since starting the Zoloft as prescribed by Dr. Rankin. (AR 822). She had also started a new job but was concerned that she would have problems managing all the tasks as she had difficulties with multi-tasking. (*Id.*). She had thought her living situation was resolved but she was unable to relocate as planned, so continued to live in a one-bedroom apartment with her son. (*Id.*). Plaintiff also expressed frustration and guilt that she was unable to provide more help to her elderly mother in Florida. (*Id.*). Plaintiff had symptoms to include anhedonia, irritability, depressed mood, decreased energy and concentration, hopelessness, and guilt. (*Id.*). Ms. Ramsden found plaintiff alert, oriented to time, person, place who was casually dressed and well-groomed. (AR 823). She was candid, cooperative, with good eye contact, and a normal rate and rhythm of speech. (*Id.*). Her thought process was linear and logical, her thought content appropriate to the session, and her insight and judgment good. (*Id.*). Her mood and affect were anxious, but she did not exhibit any evidence of psychosis, reporting that she felt safe to leave the session. (*Id.*). Ms. Ramsden noted that plaintiff was making progress towards her goals and treatment plan as shown by the reported reduction in her anxiety symptoms. (*Id.*).

At plaintiff's next appointment on July 3, 2018, plaintiff reported little progress towards her goals and treatment plan which Ms. Ramsden agreed with, noting plaintiff's PHQ9 and GAD7 scores. (AR 820–21). Plaintiff explained that her son was not doing well; he did not

"seem normal" and she did not know what to do. (AR 820). She had repeatedly attempted to assist her son to schedule appointments, but he did not take the initiative to locate his medical insurance information. (*Id.*). Further, he often became frustrated about his job and their living situation, so would be verbally abusive toward plaintiff. (*Id.*). She had symptoms to include a depressed mood, anhedonia, guilt, decreased energy, decreased concentration, irritability, and hopelessness. (*Id.*). Ms. Ramsden and plaintiff discussed the importance of plaintiff avoiding "rescuing behavior" with her son and plaintiff agreed to start looking for ways that she could stop enabling her son's lack of achievement and ambition. (*Id.*).

Plaintiff saw Ms. Ramsden two weeks later on July 17, 2018 and she reported a little progress toward her goals and treatment plans given her ability to use coping skills taught in the therapy session. (AR 816–17). Although plaintiff stated that she was sleeping better and generally felt calmer, she was still "very depressed." (AR 817). She was planning on resigning from her job at Sephora because the pace was too quick, and she was experiencing increased physical pain in her knees and shoulders. (*Id.*). She and her son had moved to a larger apartment, which had helped both of their moods, and she was continuing to work on avoiding enabling her two adult sons, allowing them to make their own decisions. (*Id.*).

Plaintiff also saw Joshua Yoo, O.D., on July 17, 2018 for dry eyes. (AR 841). She was recommended to purchase artificial tears and apply one drop four to six times a day. (*Id.*). Additionally, she was to apply a warm compress to the eye area twice a day for five minutes. (*Id.*).

On August 7, 2018, Ms. Ramsden found that plaintiff was making a little progress toward her goals and treatment plans for the same reason given at their last session—plaintiff's ability to use coping skills. (AR 818–19). Plaintiff had moved into a new apartment but

described it as "the move from hell." (AR 818). The apartment had not been cleaned or maintained and, due to several disputes with the management staff, plaintiff's level of anxiety had significantly increased. (*Id.*). She reported that she was always having to fight and was tired of taking care of other people. (*Id.*). Plaintiff's son had shown improvement in attending work regularly and his ability to focus at work. (*Id.*). Plaintiff's mother was visiting from Florida, so she was trying to tidy her apartment for the visit. (*Id.*). She reported medication adherence and noted that it was really helping; she did not know how she would be doing without it. (*Id.*).

On August 31, 2018, plaintiff reported to Ms. Ramsden that she was getting more depressed. (AR 814–15).[11] Her mother was returning to Florida, but plaintiff felt that her mother's condition was getting worse. (AR 814). She reported that her son had been interviewing for new jobs which potentially could help their financial stress, but overall, plaintiff felt sadness and frustration at where her life was—"I have worked hard all my life and look how I am now." (*Id.*). She also expressed that she would like to help her son by working but that, given her medical conditions, she was unable to. (*Id.*). Despite this, Ms. Ramsden found that plaintiff had made progress toward her goals and treatment plan because she was implementing and using the skills taught in their therapy sessions. (AR 815).

Dr. Lee prepared a second letter on September 20, 2018 stating plaintiff has a "chronic history of fibromyalgia and arthritis" which cause pain "at baseline," but are "greatly exacerbated by physically demanding work." (AR 780).[12] Although plaintiff had worked various jobs despite these conditions, Dr. Lee noted that her fibromyalgia and arthritis had

---

[11] This appointment appears to be the last reported therapy session with Ms. Ramsden included in the AR.

[12] There is no previous mention or diagnosis of fibromyalgia in any of plaintiff's medical records.

28

worsened, and she was significantly impaired. (*Id.*). Further, Dr. Lee commented that both conditions were incurable and unlikely to improve given their nature and plaintiff's age. (*Id.*).

Plaintiff visited the psychotherapy department at Kaiser's Burke Medical Center from September 24, 2018 through October 12, 2018 as part of an intensive outpatient program to receive treatment for her major depressive disorder, recurrent episode, and generalized anxiety disorder. (AR 794). As part of the program, plaintiff attended a series of psychotherapy counseling sessions which addressed a range of topics to include self-esteem (AR 796–97), depression coping skills (AR 798–99), healthy thinking (AR 800–01), stress management (AR 802–03), boundaries (AR 804–05), positive thinking (AR 806–07), and emotions (AR 808–09). Plaintiff was considered an active participant in many of these sessions. (*See, e.g.*, AR 801, 807). She also exhibited an expressive affect, a mild anxious or depressive mood, and content appropriate to the psychotherapy session with no evidence of any destructive ideations. (*See, e.g.*, AR 808, 810). Improvement in plaintiff's symptoms was noted following most of these sessions. (AR 797, 799, 801, 802, 807, 809, 811).

As to plaintiff's eye condition, Dr. Mahesh verified his treatment of plaintiff on October 31, 2018, noting plaintiff's first visit in January 2018 complaining of poor vision. (AR 839). Plaintiff was found to have a history of macula off retinal detachment which was repaired while living in Florida. (*Id.*). Following this, plaintiff developed a dense cataract in her right eye and underwent lens implantation. (*Id.*). This resulted in 20/40 vision in her right eye and 20/25 in her left eye. (*Id.*). Dr. Mahesh explained that the vision in plaintiff's right eye was "slightly subnormal" due to the macula off retinal detachment. (*Id.*).

## D.     The ALJ's Decision on January 31, 2019

The ALJ concluded that plaintiff was not disabled under sections 216(i), 223(d), and

1614(a)(3)(A) of the Social Security Act based on her application for DIB and SSI for the period

July 26, 2016 through the date of the decision, January 31, 2019.  (AR 29).  When determining

whether an individual is eligible for DIB and/or SSI, the ALJ is required to follow a five-step

sequential evaluation.  It is this process the court examines to determine whether the correct legal

standards were applied and whether the ALJ's final decision is supported by substantial

evidence.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).

Specifically, the ALJ must consider whether a claimant: (1) is currently engaged in

substantial gainful employment; (2) has a severe impairment; (3) has an impairment that meets or

equals any of the impairments listed in Appendix 1, Subpart P of the regulations that are

considered *per se* disabling; (4) has the ability to perform past relevant work; and (5) if unable to

return to past relevant work, whether the claimant can perform other work that exists in

significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  For the

first four steps of this analysis, the claimant bears the burden to prove disability.  *See* 20 C.F.R.

§§ 404.1560(c)(2), 416.960(c)(2).  The burden then shifts to the Commissioner at step five.  20

C.F.R. §§ 404.1560(c)(2), 416.960(c)(2).  When considering a claim for DIB, the Commissioner

must determine whether the insured status requirements of sections 216(i) and 223 of the Social

Security Act are met.  *See* 42 U.S.C. §§ 416(i), 423.  (AR 19).  The regulations promulgated by

the Social Security Administration also provide that all relevant evidence will be considered in

determining whether a claimant has a disability.  *See* 20 C.F.R. §§ 404.1520(a)(3),

416.920(a)(3).

Here, the ALJ made the following findings of fact:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2020;

(2) The claimant engaged in substantial gainful activity during the following periods: 3rd quarter of 2016 and 1st quarter of 2018;

(3) However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity;

(4) The claimant has the following severe impairments: loss of vision, osteoarthritis of the bilateral hands, disorders of the urinary tract, and degenerative joint disease of the right shoulder;

(5) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;

(6) [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand and walk for 6 hours in an 8-hour workday; can only occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, and crawl; never climb ropes, ladders, or scaffolds; can only frequently bilaterally handle, finger, and feel; occasionally reach overhead with the right and dominant arm; frequently reach in all other directions with the right arm; can only occasionally be exposed to moving mechanical parts and unprotected heights; can only occasionally be exposed to vibration; can only occasionally perform tasks requiring depth perception; and occasionally perform tasks requiring peripheral vision on the right;

(7) The claimant is capable of performing past relevant work as a Legal Secretary and Secretary. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity;

(8) The claimant has not been under a disability, as defined in the Social Security Act, from July 26, 2016, through the date of this decision.

(AR 20–29).

# IV. ANALYSIS

## A.    Overview

Plaintiff's motion for summary judgment argues that the ALJ committed two errors. (Docket no. 21 at 4–21). Plaintiff's first argument centers on the ALJ's finding that her medically determinable mental impairments did not result in any mental limitations on her ability to work. (*Id.* at 4–11). Specifically, plaintiff asserts that her mental impairments caused more than minimal work-related limitations, that the ALJ failed to apply the *de minimis* standard at step two of his evaluation when considering her mental impairments and limitations, and that the ALJ failed to assist her, as an unrepresented individual, at the hearing as demonstrated by his refusal to question the vocational expert about plaintiff's mental impairments and to assist her in undertaking such questioning. (*Id.*). Plaintiff's second argument turns to her hand limitations which, she contends, the ALJ did not properly account for in his residual functional capacity assessment given that he failed to properly evaluate the evidence in the record concerning this impairment. (*Id.* at 11–21). In particular, plaintiff refers to the worsening of her condition in 2018, her self-described limitations explaining how her hand impairments interfered with her employment, and how the underlying record was consistent with and supported her reported limitations. (*Id.* at 14–17). Further, plaintiff asserts that the ALJ relied on a selective reading of the record and "legally insufficient reasons" to deny her benefits rather than engaging in the proper evaluation required by 20 C.F.R. § 404.1529 and failed to acknowledge or even discuss her work history. (*Id.* at 17–21). For the reasons discussed below, the undersigned finds that substantial evidence supports the ALJ's residual functional capacity determination as to plaintiff's mental impairments, but the decision fails to provide an adequate explanation for the inclusion of frequent bilateral handling, fingering, and feeling given the diagnosis of bilateral hand osteoarthritis and the reported worsening of plaintiff's condition in 2018.

**B.**   **Substantial Evidence Supports a Finding that Plaintiff's Mental Health Impairments were Non-Severe**

*(i) The ALJ Did Not Err at Step Two of the Analysis*

Plaintiff's first challenge asserts that the ALJ failed to apply the *de minimis* standard at step two of the sequential analysis when considering her mental impairments and resulting limitations. (Docket no. 21 at 9–10). Citing to numerous treatment records, plaintiff argues that no "reasonable mind" could conclude that her mental impairments did not result in limitations upon her ability to perform work-related functions and that the ALJ erred by finding otherwise. (*Id.* at 10). Further, plaintiff contends that this error is "particularly harmful" as the ALJ denied benefits based on his finding at step four of the analysis that she could return to past skilled work. (*Id.*). Plaintiff points to Social Security Ruling ("SSR") 85-15 for the premise that the SSA acknowledges that mental impairments are significant upon a claimant's ability to perform skilled work. (*Id.*). She also refers to the vocational expert's testimony that, if plaintiff were unable to perform her past work, she could only perform one job; namely, a data entry clerk position which, pursuant to the Dictionary of Occupational Titles, is considered semi-skilled employment. (*Id.*). Given these contentions, plaintiff argues that the ALJ's failure to include any mental limitations in her residual functional capacity was not only harmful error but also likely outcome-determinative. (*Id.*).

The Commissioner responds that the ALJ appropriately used the "special technique" set forth in 20 C.F.R. §§ 404.1520a, 416.920a to determine the severity of plaintiff's mental impairments, assessing plaintiff's difficulties in the four broad functional areas of (1) understanding, remembering or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (Docket no. 24 at 14–15). As the ALJ found that plaintiff had no more than "mild" limitations in these

functional areas, the Commissioner asserts that the ALJ correctly determined that plaintiff's mental impairments were non-severe. (*Id.* at 16). The Commissioner goes on to contend that the ALJ appropriately considered but declined to include a limitation within plaintiff's residual functional capacity to account for her non-severe mental impairments. (*Id.* at 17–19). Given this, the Commissioner asserts that the ALJ properly determined that plaintiff's non-severe mental impairments did not cause limitations that impacted her ability to perform her past skilled work. (*Id.* at 18).

At step two of the sequential analysis, the ALJ must determine whether the claimant has a severe, medically determinable physical or mental impairment. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.921. An impairment, or combination of impairments, is considered "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is considered "not severe" when the "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on a[] [claimant]'s ability to work even if the individual's age, education, or work experience were specifically considered." SSR 85-28; *see also* SSR 16-3p. The claimant bears the burden of proving that an impairment is severe. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). "Step two of the sequential evaluation is a threshold question with a de minimis severity requirement." *Felton-Miller v. Astrue*, 459 F. App'x 226, 230 (4th Cir. 2011) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153–54 (1987)); *see also Miller v. Colvin*, No. 2:13-cv-31251, 2015 WL 917772 (S.D. W. Va. Mar. 3, 2015) ("The step-two inquiry is a de minimis screening device to dispose of groundless claims") (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

To determine the severity of mental impairments, the ALJ must follow a "special technique" as set forth in the regulations. 20 C.F.R. §§ 404.1520a, 416.920a. First, the ALJ evaluates the claimant's "pertinent symptoms, signs, and laboratory findings to determine whether [the claimant] ha[s] a medically determinable mental impairment(s)." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Second, the ALJ must "rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2). The SSA has identified four broad functional areas in which the ALJ rates a claimant's degree of functional limitation: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ assesses the degree of limitation using a five point scale: none, mild, moderate, marked, or extreme. 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). If the ALJ finds that the degree of limitation is "none" or "mild," then generally the ALJ concludes that the claimant's impairment is not severe. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1).

If the claimant has a severe impairment—whether mental or physical—the sequential analysis proceeds to the next step. If, at step three, the ALJ finds that the claimant's impairments do not meet the requirements of the listed impairments in Appendix 1, then the ALJ must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.945(e). Residual functional capacity is "the most [the claimant] can still do despite her limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is based "on all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The ALJ must consider all of the claimant's impairments, including those impairments considered "not severe." 20 C.F.R. §§ 404.1545(a)(2), 416.945. In assessing a claimant's residual functional capacity, the ALJ

35

considers the claimant's ability to meet "the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4).  At step four of the sequential analysis, the ALJ determines whether the claimant has the residual functional capacity to perform the requirements of her past relevant work; if the claimant does, then she is not disabled.  20 C.F.R. §§ 404.1520(f), 416.920(f).

Here, at step two of the evaluation, the ALJ found plaintiff had the severe impairments of "loss of vision, osteoarthritis of the bilateral hands, disorders of the urinary tract, and degenerative joint disease of the right shoulder."  (AR 21).  Accordingly, the sequential process proceeded to step three.  Thus, even if the ALJ erred by not considering plaintiff's mental impairments to be severe at this stage, plaintiff suffered no harm because the outcome at step two of the evaluation was the same—her application for benefits proceeded to the next step.  Plaintiff "stresses" that this analysis "misses the point" because the ALJ's findings as to her mental impairments "inexorably resulted in a legally insufficient [residual functional capacity] finding." (Docket no. 21 at 5).  But this is not so.  Plaintiff's challenge is unpersuasive given the presumption that she heavily relies on: that her mental impairments result in limitations upon her ability to perform work-related functions.  (*Id.* at 10).  However, the ALJ found plaintiff's medically determinable mental impairments of anxiety disorder and affective disorder, when considered singly and in combination, did not cause more than a minimal limitation in her ability to perform basic work activities and were, therefore, non-severe.  (AR 21).  In reaching this determination, the ALJ correctly considered the "paragraph B" criteria—the four broad functional areas set out in the regulations in order to evaluate mental disorders.  (AR 21–22).

The ALJ first addressed any functional limitations in plaintiff's ability to understand, remember, or apply information.  (AR 22).  He noted that plaintiff reported that she needed

reminders to take her medications and written and spoken instructions repeated. (*Id.*). However, the ALJ cited the June 4, 2018 treatment notes from plaintiff's treating psychiatrist, Dr. Rankin, finding that her intellectual functions and memory appeared normal, she had normal cognitive function and appropriate thought content, and her thought process was logical. (*Id.*). As such, the ALJ concluded that plaintiff had only a mild limitation in this category. (*Id.*). Next, the ALJ considered plaintiff's ability to interact with others. (*Id.*). The ALJ reviewed plaintiff's self-report regarding this functional area noting that she did not have "significant difficulties," that she engaged in social activities and got along with authority figures, and that she had never been fired from a job as a result of conflicts with others. (*Id.*). Moving to examination of plaintiff, the ALJ noted plaintiff's affect was slightly distressed but that she was cooperative, oriented to person, place, date, and situation, with normal speech. (*Id.*). She was able to engage with the examiner, relate well, and maintain eye contact. (*Id*). Accordingly, the ALJ determined that plaintiff had only a mild limitation in this area. (*Id.*).

The ALJ then discussed plaintiff's limitations in the area of concentration, persistence, or pace. (*Id.*). Plaintiff self-reported that she could only pay attention for short periods of time and that after a while, she was distracted; consequently, she did not finish what she started. (*Id.*). However, the ALJ noted on examination plaintiff's concentration was normal, she was alert, and oriented to time, place, and person. (*Id.*). Based on these treatment notes, he concluded that plaintiff had only mild limitations in this category. (*Id.*). Finally, the ALJ moved to the fourth functional area of adapting or managing oneself. (*Id.*). Plaintiff detailed she had difficulties handling stress and changes in routine but also reported that she did her own laundry, prepared her own meals, and washed dishes. (*Id.*). On examination, the ALJ noted that plaintiff was well-groomed and appropriately dressed and her judgment was good and socially appropriate. (*Id.*).

Her impulse control was average. (*Id.*). Consequently, the ALJ found plaintiff possessed only mild limitations in this category. (*Id.*). Because plaintiff's impairments caused no more than "mild" limitations in any of the functional areas, the ALJ determined plaintiff's mental impairments were non-severe. (*Id.*) (citing 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1)). The ALJ, throughout his analysis, clearly cited to the record, noting specific facts which informed his conclusions regarding the severity of plaintiff's mental impairments. And, although plaintiff provides an abundance of examples from the record that the ALJ did not reference in an attempt to demonstrate her limitations in the four functional areas, the ALJ is not required to specifically refer to *every* piece of evidence in his decision. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

As discussed by the ALJ in the portion of his decision concerning plaintiff's residual functional capacity, the opinions of the Agency psychiatric consultants provide further support for the finding that plaintiff's mental conditions were no more than mild and did not require any mental limitations be included in that assessment. At both the initial and reconsideration determination levels, the consultants opined that plaintiff, "at most," had mild limitations pertaining to the paragraph B functional areas. (AR 27). The ALJ assigned great weight to these opinions to the extent they were consistent with evidence in the record that showed plaintiff "generally had a normal mood and affect," her behavior was within normal limits, she was oriented to person, place, and time, and she had no cognitive defects. (*Id.*).

A review of the administrative hearing also demonstrates discussion of plaintiff's mental impairments and provides insight into the rationale behind the ALJ's conclusions at step two and in his residual functional capacity assessment. The ALJ asked plaintiff to tell him about her depression and anxiety to which plaintiff detailed how both had deteriorated as she faced her

health issues. (AR 126–27). She noted that she no longer had the ability to do work that she enjoyed which made her "very depressed" and that she was anxious because she had no other way of making a living. (AR 127). She outlined that she took Sertraline and participated in an intensive outpatient program that she found "very, very helpful" as it taught her some skills to cope with her feelings. (*Id.*). The program also helped her to understand that she "really, really needed" to take care of her mental health. (*Id.*). The ALJ also asked plaintiff if she was able to do any chores in the house and what she did during the day. (AR 128). Plaintiff explained that she could do easy things, such as putting items in the microwave, but that her son had to do the cutting. (*Id.*). She was able to do the dishes and make the bed, but her son had to clean the bathroom. (*Id.*). Mainly, her son went to the supermarket, but she could go for "very light stuff." (AR 128–29). The ALJ clearly considered this in his decision, referring to plaintiff's statements during his paragraph B analysis. (*See* AR 22).

As noted above, plaintiff contends that the ALJ's failure to include any limitation concerning her mental impairments in the residual functional capacity assessment was not just harmless error but also likely outcome-determinative. (Docket no. 21 at 10). The ALJ, in making plaintiff's residual functional capacity assessment, must consider all of her medically determinable impairments, including those he concluded were not severe. 20 C.F.R. §§ 404.1545, 416.945. However, "although some consideration is required, there is no requirement that the [residual functional capacity] reflect a claimant's non-severe impairments to the extent the ALJ reasonably determines such impairments do not actually create functional limitations on a claimant's ability to work." *Layson v. Comm'r*, No. SAG-12-1183, 2018 WL 2118644, at *2 (D. Md. Feb. 21, 2018) (quoting *Perry v. Colvin*, No. 2:15-cv-01145, 2016 WL 1183155, at *5 (S.D. W. Va. Mar. 28, 2016); *see also Presnell v. Colvin*, No. 1:12-cv-299, 2013 WL 4079214,

at *4 (W.D.N.C. Aug. 13, 2013) ("The ALJ determined in step three that [p]laintiff's mental impairments were non-severe, and as a result, concluded that they caused little or no functional limitation which would impact the ALJ's analysis of [p]laintiff's [residual functional capacity]."). Here, in his residual functional capacity explanation, specifically while assigning weight to the opinions of the Agency psychiatric consultants, the ALJ expressly considered plaintiff's mental impairments by referencing the mild limitations she had in the paragraph B criteria. (AR 27). He credited the opinions as consistent with the evidence in the record which showed, for example, plaintiff's behavior was within normal limits and she had a normal mood and affect. (*Id.*). The ALJ reached the conclusion that plaintiff's mental impairments caused no functional limitation which would affect her residual functional capacity to perform basic mental work activities and, as such, properly did not include any such limitation to that effect.

The ALJ analyzed the evidence, including plaintiff's own statements, opinion evidence, and treatment records, to support his finding that plaintiff's mental impairments were non-severe and caused no more than minimal limitations to perform basic mental work activities. Accordingly, substantial evidence in the record supports the ALJ's decision on this issue.

### (ii) The ALJ Adequately Developed the Record

As part of her argument, plaintiff also contends that the ALJ erred by refusing to question the vocational expert about her mental impairments and failing to assist her to question the vocational expert. (Docket no. 21 at 10). Plaintiff refers to the ALJ's "heightened duty to assist her" because she was unrepresented at the hearing in December 2018. (*Id.* at 3–4, 10). Specifically, she contends that although the ALJ offered her some assistance in her attempt to obtain further information from the vocational expert concerning the impact of her hand limitations, he abruptly ended the hearing after plaintiff had "raised a perfectly probative and

relevant line of inquiry" regarding the limitations caused by her mental impairments, much to her prejudice. (*Id.* at 11). Plaintiff asserts that the only appropriate remedy here is a remand. (*Id.*).

The Commissioner asserts that the ALJ fully and fairly developed the record and provided "ample time" for testimony and development during the hearing. (Docket no. 24 at 19–20). Specifically, the Commissioner contends that the ALJ assisted plaintiff in asking the vocational expert questions, converting a number of her statements into limitations for the vocational expert to consider. (*Id.* at 21). And, although he did not convert one particular statement into a limitation—a statement concerning plaintiff's depression and medication side effects—the Commissioner argues that this did not result in any harm to plaintiff given the finding that her mental impairments were not severe and did not cause any functional limitations. (*Id.*). Further, the Commissioner asserts that the ALJ was not required to ask additional hypothetical questions and, in any case, such hypotheticals would not have been relevant as the ALJ did not adopt any limitations based on plaintiff's mental impairments. (*Id.*).

The ALJ has a duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record[] and cannot rely only on the evidence submitted by the claimant when that evidence is inadequate." *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (citing *Walker v. Harris*, 642 F.2d 712, 714 (4th Cir. 1981) and *Marsh v. Harris*, 632 F.2d 296, 300 (4th Cir. 1980)). This duty applies whether or not the claimant is represented, although when the claimant is not represented the duty is heightened. *Crider v. Harris*, 624 F.2d 15, 17 (4th Cir. 1980); *see also Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *Sandy v. Astrue*, No. 1:08cv120, 2009 WL 2006882, at *15 (N.D. W. Va. July 9, 2009). However, an ALJ is "not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark v. Shalala*, 28 F.3d 828, 830–31 (8th Cir. 1994). A remand is proper

41

only "where the absence of counsel created clear prejudice or unfairness to the claimant." *Sims*, 631 F.2d at 28.

Plaintiff's contention that the ALJ failed to show a heightened duty of care by failing to assist her in obtaining information from the vocational expert about the impact of her mental impairments on her ability to work is, at best, a stretch. A brief review of pertinent case law demonstrates this. In *Walker v. Harris*, the plaintiff had only four years of formal education and appeared for a hearing that lasted only nineteen minutes and consisted of a "barely-coherent rambling monologue." 642 F.2d at 714. The Fourth Circuit held that the ALJ had made no effort to focus the plaintiff's testimony, simply waiting for her to exhaust herself, thus failing in her duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Id.* In *Marsh v. Harris*, the plaintiff was "completely unschooled on the requirements for proving his case" and his testimony proved "sketchy" with "incomplete information." 632 F.2d at 299. Further, the ALJ breached his promise to the plaintiff that he would obtain additional evidence from the treating physician. *Id.* The Fourth Circuit held that the ALJ did not "fully inquire into the issues necessary for adequate development of the record, and such failure [was] prejudicial to the claimant." *Id.* at 300. By contrast, in *Craig v. Chater*, the Fourth Circuit held that the ALJ "fully discharged" his duty to the *pro se* plaintiff, questioning her about "all relevant matters." 76 F.3d at 591. The ALJ inquired about the plaintiff's "education level[], her ability to read and write, her living conditions, her former work, her daily activities, and her subjective complaints of pain." *Id.* Furthermore, the ALJ reviewed the plaintiff's medical records in "painstaking detail." *Id.*

Here, like the ALJ in *Craig*, a review of the hearing shows that the ALJ fully discharged his duty to plaintiff. He fully explored the facts and inquired into the relevant issues in order to

adequately develop the record, asking plaintiff about her education and work history (AR 92–
113), medical conditions and the limitations caused by those conditions (AR 114–27),
medications (AR 127–28) and her daily activities (128–29). He also considered her past work
history. (AR 94–114, 119, 130–33). The ALJ then proceeded to ask the vocational expert
questions (AR 134–46) and converted several of plaintiff's comments concerning her limitations
into further questions to the vocational expert (AR 147–51). The hearing itself lasted well over
an hour providing more than enough time for the development of plaintiff's testimony. (AR 85,
152). At the beginning of the hearing, the ALJ informed plaintiff of her right to representation
and how a representative could assist her. (AR 86). He also checked that plaintiff wanted to
continue with the hearing after providing her with the opportunity to postpone the hearing in
order to obtain representation. (AR 88). The ALJ confirmed that the record was complete,
clarifying when the last exhibit was received and what the documents referred to. (AR 89–90).
Plaintiff's hearing was thorough, covering all relevant matters pertaining to the issues at hand,
and ensuring an opportunity for adequate development of the record.

Further, plaintiff was not prejudiced by the ALJ's failure to include limitations
concerning her depression and the side effects of her medication into additional hypotheticals to
the vocational expert. Plaintiff cites to *Mascio v. Colvin* in support of her contention that a
remand is the only appropriate remedy for the ALJ's failure to assist plaintiff in obtaining
information from the vocational expert regarding the impact of her mental impairments. (Docket
no. 21 at 11). In *Mascio*, the Fourth Circuit held that the ALJ's hypothetical to the vocational
expert was legally insufficient because it failed to properly account for the plaintiff's moderate
limitations in concentration, persistence, or pace. 780 F.3d 632, 638 (4th Cir. 2015). The ALJ
provided no explanation as to how the plaintiff's limitations in concentration, persistence, or

pace affected her residual functional capacity. *Id.* The court noted, however, that remand is not automatically required when an ALJ fails to explicitly account for these limitations in his hypothetical to the vocational expert. *See id.* For example, "the ALJ may find that the concentration, persistence, or pace limitation does not affect [the claimant's] ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert." *Id.* Plaintiff's case here is distinguishable from *Mascio* in that she suffered from only mild limitations in the Paragraph B criteria, to include concentration, persistence, or pace, as opposed to the moderate limitations the plaintiff in *Mascio* faced. As noted in the ALJ's decision, he found plaintiff's mental impairments non-severe and caused no more than a minimal limitation on plaintiff's ability to perform basic mental work activities. (*See* AR 21). Thus, the ALJ did nor err in failing to ask a hypothetical question that was not supported by the record or assist plaintiff to ask such a hypothetical herself. Plaintiff was, therefore, not prejudiced nor subject to unfairness. All the more indicative of this is the fact that plaintiff's own testimony at the hearing concentrated fairly substantially on her physical impairments and the impact of these on her more recent employment.

The ALJ adequately developed the record and fulfilled his heightened duty to assist plaintiff. Substantial evidence supports his determination that further limitations in plaintiff's residual functional capacity were not warranted based on her mental impairments which the ALJ found to be non-severe with only a minimal limitation on her ability to perform basic mental work activities.

**C.     The ALJ Failed to Provide an Adequate Explanation to Support the Finding
in the Residual Functional Capacity that Plaintiff Could Frequently
Bilaterally Handle, Finger, and Feel**

Plaintiff's second challenge contends that the ALJ primarily relied on "outdated opinion

evidence" to include a limitation in his residual functional capacity assessment that only partially

described plaintiff's limitations relating to the arthritis in her hands. (Docket no. 21 at 13).

More specifically, plaintiff argues that the ALJ did not properly perform the second part of the

evaluation process as set forth in 20 C.F.R. § 404.1529, inaccurately finding that the objective

medical evidence did not support any additional manipulative limitations.  (*Id.* at 17–20).

Further, plaintiff points to the ALJ's lack of consideration of "other evidence" in the record;

namely, her self-described limitations as included in her Adult Function Report and her hearing

testimony.  (*Id.* at 17–18).  Plaintiff also contends that the ALJ's consideration of the medical

opinions, included under the umbrella of "other evidence," was insufficient.  (*Id.* at 18–19).  In

particular, plaintiff argues that the arthritis in her hands significantly worsened in 2018 as shown

by her complaints to Dr. Lee and the x-rays of her hands taken in May 2018, that the ALJ relied

on "outdated evidence" from the disability examination in April 2017, and the ALJ had no

reasonable basis to assign "little weight" to the most recent opinion of Dr. Lee.  (*Id.* at 18).

The Commissioner responds that substantial evidence supports the ALJ's evaluation of

plaintiff's hand limitations.  (Docket no. 24 at 21).  First, the Commissioner contends that

substantial evidence supports the ALJ's finding that plaintiff's subjective complaints were not

entirely consistent with the medical evidence and other evidence in the record.  (*Id.* at 23–24).

Second, the Commissioner asserts that the ALJ considered all the evidence, including "other

evidence," to formulate plaintiff's residual functional capacity.  (*Id.* at 27).  Notably, the

Commissioner argues that the ALJ correctly assigned weight to the Agency physicians' opinions

45

and considered them in conjunction with later acquired evidence, and correctly discounted Dr. Lee's opinion given its inconsistency with the record and its lack of specificity as to manipulative limitations. (*Id.* at 26–27).

As noted above, after step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(a)(1), 416.920. A claimant's residual functional capacity must incorporate impairments that are supported by the objective medical evidence and those impairments that are based on the claimant's subjective statements. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also* SSR 16-3p. The ALJ follows a two-step process in evaluating a claimant's subjective symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a). First, the ALJ is to determine whether there is an underlying medically determinable physical or mental impairment, or impairments, that could reasonable cause the claimant's pain or other related symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b). A medically determinable impairment is defined as one that can be shown by medically acceptable clinical or laboratory diagnostic techniques. 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, if the underlying impairment reasonably could produce the claimant's pain, then the ALJ is required to evaluate the claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they affect the claimant's ability to work. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ must consider "other evidence" in the record, not just the objective medical evidence. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff argues that the ALJ's "insistence" that the objective medical evidence did not support any additional manipulative limitations in her residual functional capacity is "both factually inaccurate and legally insufficient." (*See* Docket no. 21 at 17). In support of her

46

contention, plaintiff first focuses on the medical records which, she asserts, demonstrate her ongoing complaints concerning her bilateral hand pain. (*Id.*). In his decision, the ALJ correctly found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 24). In support of this finding, and specifically in relation to plaintiff's hand pain, the ALJ noted certain medical records which demonstrated plaintiff's osteoarthritis of the bilateral hands, but he found plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms not entirely consistent with the medical and other evidence in the record. (*Id.*). Working chronologically as to complaints concerning plaintiff's bilateral hand pain, the ALJ included plaintiff's visit to Ms. Guest in late June 2016,[13] presenting with, among other complaints, bilateral hand pain. (*Id.*). Ms. Guest's examination did not show the presence of any musculoskeletal issues. (AR 24–25). Next, the ALJ referred to plaintiff's diagnosis in January 2018 of osteoarthritis by Dr. Lee. (AR 25). Moving to March 2018, the ALJ noted plaintiff's visit to Dr. Lee where she presented with pain, tingling, and numbness in her right hand. (*Id.*). As the ALJ stated, Dr. Lee found that plaintiff had some tenderness to palpitation and moderate tension along the posterior right neck and trapezius muscles but no focal findings or movement disorders. (*Id.*). Finally, the ALJ mentioned the results of the x-rays of plaintiff's hands in May 2018 which showed "changes of inflammatory arthropathy involving the carpometacarpal ("CMC") joints and the distal interphalangeal ("DIP") joints of multiple digits bilaterally." (*Id.*). Further, the x-rays showed, on the right side, some erosions "in the radial side of the distal aspects of the proximal phalanges." (AR 25–26). The

---

[13] The ALJ mistakenly puts this visit in "late July 2016," but as the medical records indicate, the visit occurred on June 30, 2016. (AR 564–65). The ALJ did not address the medical records concerning plaintiff's hand complaints in 2015 and early 2016 that precede her alleged disability date. (AR 571–72, 567–68).

x-rays also indicated "mild subluxation of the CMC joint in the left hand similar to the right";

"erosive change at the DIP joints of the index finger, long finger, ring finger, and little finger";

and "soft tissue swelling and mild swan-neck deformity . . . at the fifth digit." (AR 26). The

radiocarpal joint (of the left hand), however, was "preserved." (*Id.*). Without providing any

further explanation, the ALJ concluded by stating that he had "appropriately accommodated"

plaintiff's osteoarthritis in her residual functional capacity to include postural, exertional,

manipulative, and reaching limitations. (*Id.*). Namely, plaintiff's bilateral hand osteoarthritis

was considered by the restriction that she could "only frequently bilaterally handle, finger, and

feel" along with her limitation to light work with additional restrictions concerning lifting,

carrying, pushing, pulling. (*See* AR 23).

 Plaintiff's second focus shifts to the consideration of "other evidence" and asserts that the

ALJ did not adequately do this, as most significantly demonstrated by his reliance on "outdated

opinions" resulting in his findings resting "solely on his lay interpretation of the medical

evidence." (Docket no. 21 at 17–18). First, although not explicitly stated, plaintiff indicates by

reference to SSR 16-3p that the ALJ disregarded her statements about the intensity, persistence,

and limiting effects of her symptoms and, to that end, details her responses to an Adult Function

Report in 2016 and her testimony at the hearing in December 2018. (*Id.* at 14–15, 17). In

particular, and again specifically referring to her hand complaints, in the Adult Function Report

plaintiff explained that her impairments affected the use of her hands and interfered with her

ability to work. (*Id.* at 14). In her responses to a Supplemental Pain Questionnaire, plaintiff

claimed that her hands and fingers would "go numb," that she could not bend them because it

hurt to do so, and that they were very swollen due to her arthritis. (*Id.*). Although she felt better

with anti-inflammatory medication, this did not eliminate her pain completely and she struggled

to conduct daily activities of living such as cleaning and laundry. (*Id.*). Plaintiff also refers to her testimony at the December 2018 hearing where she explained that her arthritis prevented her from being able to type like she used to and, that due to lack of strength in her fingers, her handwriting had changed. (*Id.*). Further, plaintiff explained that the decreasing strength in her hands caused her to drop things and made it difficult for her to open things, such as jars, and to grasp items—holding a gallon of milk with her right hand was "very difficult." (*Id.* at 14–15). Plaintiff asserts that these descriptions are "patently consistent" with and supported by treatment records and in "direct contrast" to the ALJ's finding that she only had minimal limitations in her hands. (*Id.* at 15).

 As shown in the decision, the ALJ did refer to her testimony and statements. (AR 24). He noted that plaintiff alleged disability due, in part, to her osteoarthritis of the bilateral hands. (*Id.*). He also detailed plaintiff's statements that "she had limited strength in her hands due to arthritis" which predominantly affected her right hand and that she had trouble reaching with the same hand. (*Id.*). The ALJ also considered plaintiff's statements pertaining to her other impairments, such as her loss of vision, degenerative joint disease of the right shoulder, and disorders of the urinary tract. (*Id.*). And, as part of the two-step process, the ALJ found that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.*). While the ALJ did not "disregard" plaintiff's subjective statements, he failed to provide an adequate explanation as to his finding that plaintiff was able to "frequently bilaterally handle, finger, and feel." As noted in the decision, the ALJ relied heavily on the examination by Mr. Kaplan in April 2017 finding that plaintiff had a good grip, her motor strength was grossly 5-/5, her sensation was grossly intact, her range of motion was intact, and fine motor

coordination was grossly within functional limits. (AR 25, 27). The ALJ also considered plaintiff's daily activities including washing dishes, microwaving food, and making her bed and that she was working at L'Occitane in a retail position in 2018. (AR 24).

Plaintiff takes issue with the ALJ's "reliance" on the medical opinions of the Agency consultants and his discounting of Dr. Lee's opinions. (Docket no. 21 at 17–18). Specifically, plaintiff asserts that the ALJ did not have a reasonable basis to credit the Agency's medical consultants' opinions finding that she was capable of "frequent fingering with the left nondominant hand" given that the Agency's consultative examiner saw plaintiff in April 2017 and the Agency non-examining consultants reviewed her records in December 2016 and February 2017. (*Id.* at 18). These opinions, plaintiff explains, occurred "long before" the x-rays were taken of her hands in May 2018, the worsening of her bilateral hand pain, and Dr. Lee's opinion in September 2018. (*Id.*). Moreover, plaintiff contends that the ALJ did not have a reasonable basis to only assign "little weight" to Dr. Lee's opinion based on its alleged inconsistency with the objective medical evidence and the consultative examiner's assessment in April 2017. (*Id.*). Plaintiff asserts that Dr. Lee's assessment, based largely on his own treatment notes, was consistent with the medical evidence—**such as the x-ray of her hands in May 2018**—showing how the osteoarthritis of the bilateral hands was worsening. (*Id.*).

In his decision, the ALJ proceeded to evaluate and weigh the opinion evidence beginning with the Agency medical consultants at the initial determination level. (AR 26). Assigning the opinions "partial weight," the ALJ noted that the opinions limited plaintiff to "a medium exertion level with no postural limitations and only frequently fingering with the left non-dominant hand." (*Id.*). However, the ALJ found these opinions were only "partially consistent" with the objective medical evidence detailing that although plaintiff's osteoarthritic changes in both

hands, alongside her slightly decreased vision on the right, supported manipulative, vision, and environmental limitations, the evidence supported a lighter exertion level. (*Id.*). The limitation restricting right sided reaching was supported, the ALJ explained, by the combination of plaintiff's right shoulder degenerative joint disease and her bilateral osteoarthritis. (*Id.*). The ALJ also assigned "partial weight" to the Agency medical consultants' opinions at the reconsideration level. (*Id.*). Opining that plaintiff was again limited to medium exertion level with some limitations, the ALJ found the Agency consultants' opinions inconsistent with additional objective evidence showing plaintiff's osteoarthritis in the bilateral hands which "necessitate[d] manipulative limitations." (*Id.*). Finally, the ALJ assigned "little weight" to the opinions of Dr. Lee because they contained a limited functional assessment and were therefore of little assistance in the formulation of plaintiff's residual functional capacity, and because they were inconsistent with the objective medical evidence. (AR 26–27). Of relevance here, Dr. Lee opined that plaintiff's fibromyalgia and arthritis had worsened and "she had a significant impairment that was not expected to improve." (AR 27).[14] Since Mr. Kaplan did not include any functional limitations in his April 2017 consultative examination, the ALJ did not include that report in his discussion of opinion evidence. (AR 25).

While the ALJ's assignment of weight to the Agency medical opinions appears to be appropriate, the ALJ fails to provide an adequate explanation for his finding that Dr. Lee's opinion in September 2018 that plaintiff's arthritis had worsened and that she had a significant impairment was entitled to "little weight." While the ALJ refers to the results of the examination conducted by Mr. Kaplan in April 2017, there is no discussion of the later complaints in 2018 of

---

[14] As noted by the ALJ, Dr. Lee's treatment notes contain no evidence or diagnosis of fibromyalgia. (AR 27).

increased pain, numbness, and tingling of her hands and the results of the May 2018 x-rays detailing significant findings that were not considered by the Agency doctors or Mr. Kaplan. While the opinions addressed by the ALJ postdate plaintiff's alleged disability date of July 26, 2016 and the ALJ sufficiently explained his rationale behind the weight he gave to each opinion, those opinions do not address the alleged worsening of plaintiff's bilateral hand arthritis in 2018 and the findings of the x-rays of her hands.

While the ALJ did mention the results of the x-rays of plaintiff's hands in May 2018 in his decision (AR 25–26), there is no explanation provided as to how he took the results of those x-rays into consideration in formulating the limitation included in plaintiff's residual functional capacity. The results of these x-rays indicate "changes of inflammatory arthropathy" along with findings of subluxation (dislocation) at the first CMC joints and several fingers, erosive changes in several joints, and swelling. (AR 843–44). These findings appear to support a worsening of plaintiff's condition since the consultative examination in April 2017 when Mr. Kaplan noted no fractures or dislocations in plaintiff's hands and that her joint spaces were intact. (AR 704).

Plaintiff refers to case law—*Barton v. Astrue*, *Lafferty v. Colvin*, and *Stuckey v. Colvin*—for the propositions that an ALJ has a general duty to develop the record and that he cannot substitute his own opinion for that of the medical evidence. (Docket no. 21 at 19) (citing *Barton v. Astrue*, 495 F. Supp. 2d 504 (D. Md. 2007); *Lafferty v. Colvin*, No. 1:16cv15, 2017 WL 836917 (W.D. Va. Mar. 3, 2017); *Stuckey v. Colvin*, No. 2:14cv656, 2016 WL 403651 (E.D. Va. Jan. 11, 2016)). Plaintiff argues that an ALJ is "obligated to be curious when, as here, the evidence demonstrates that the claimant's impairment has worsened since it was first evaluated by the Agency," but that the ALJ in this case did not exhibit such a trait. (*Id.*). Specifically, plaintiff asserts that no physician reviewed Dr. Lee's opinion or the results from the May 11,

2018 x-rays to determine whether the limitations he propounded were inconsistent with the record or reviewed plaintiff's testimony to assess its consistency with the underlying record. (*Id.*).[15] Moreover, plaintiff contends that the ALJ's "rejection" of Dr. Lee's opinion was "based on his own re-interpretation of the raw medical data" which was "simply an impermissible substitution of the factfinder's lay opinion for that of the medical expert." (*Id.* at 20).

In response, the Commissioner contends that the record before the ALJ was sufficient to determine whether plaintiff was disabled thus he was not required to obtain additional evidence. (Docket no. 24 at 26). Further, the Commissioner asserts that the ALJ was not required to obtain an additional medical opinion in order to assess plaintiff's residual functional capacity but rather, as he did here, consider all the evidence in the record. (*Id.* at 26–27). Regarding plaintiff's argument that the ALJ relied on "outdated evidence," the Commissioner points to the ALJ's decision to note that he "did not simply rubber stamp" the Agency physicians' opinions but assigned weight to them and explained his rationale for such weight. (*Id.* at 27). Finally, the Commissioner contends that the ALJ was correct to discount Dr. Lee's most recent opinion because it was inconsistent with the record. (*Id.* at 27–28). As such, the Commissioner argues that substantial evidence supports the ALJ's decision. (*Id.* at 28).

While the ALJ referred to treatment records, plaintiff's statements, disability evaluations, opinion evidence, employer opinions, and the prior ALJ decision in this case[16] to proceed

---

[15] The Commissioner interprets this argument as plaintiff suggesting the ALJ should obtain a "matching medical opinion in order to fashion the [residual functional capacity]." (Docket no. 24 at 26).

[16] As explained by the ALJ in his decision, the SSA interpreted the Fourth Circuit's decision in *Albright v. Comm'r of Social Sec. Admin.*, 174 F. 3d 473 (4th Cir. 1999), to hold that the SSA must consider a prior ALJ's final decision concerning a prior disability claim which contains a finding required at a step in the sequential analysis as evidence and, accordingly, give it "appropriate weight in light of all relevant facts and circumstances when adjudicating a

through the sequential analysis as required by the regulations and to render plaintiff's residual functional capacity *(See* AR 17–29), he must provide some explanation as to how he determined the limitations included in the residual functional capacity so the court can determine if the decision is supported by substantial evidence.  The Commissioner is correct that the ALJ may not have been required to obtain additional medical evidence, but there must be some reasoning provided to address the substantial objective evidence that plaintiff's condition had worsened in 2018.  Otherwise, it appears to be based on his own interpretation of the medical record.  *See Felton-Miller*, 459 F. App'x at 231 (finding that the ALJ was not required to obtain a medical expert in order to assess the plaintiff's residual functional capacity but rather properly based his determination on subjective complaints, objective medical evidence, and the opinion evidence).

As stated by the Fourth Circuit in *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015), when an ALJ fails to provide the analysis needed for the court to review meaningfully the conclusions concerning what functions a claimant may perform, especially when the record

---

subsequent disability claim involving an unadjudicated period." (AR 18).  In deciding what weight to afford the prior finding, the following factors are considered: "(1) whether or not the facts on which the prior finding was based are subject to change with the passage of time, such as a fact relating to the severity of the claimant's medical condition; (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period under consideration in the subsequent claim; and (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim." (*Id.*).

Here, the ALJ gave "great weight" to the previous ALJ decision. (AR 27).  The prior ALJ's decision limited plaintiff to a light exertion level, "except occasionally climbing ladders, ropes, scaffolds, and crawling, frequently climbing ramps and stairs, frequently balancing" and "never reaching overhead with the right arm and only occasional exposure to moving mechanical parts, unprotected heights, and vibration." (*Id.*).  The ALJ found that this was generally consistent with the objective medical evidence in the record reflecting plaintiff's vision loss, right shoulder degenerative joint disease, and osteoarthritis, but that a more recent image of plaintiff's right shoulder from March 2018 showed only mild degeneration in the right shoulder, thus did not support a total restriction in overhead reaching. (*Id.*).

contains conflicting evidence, remand is necessary.  For these reasons, the plaintiff's motion for

summary judgment must be granted in part since there is no adequate explanation for the finding

that plaintiff could frequently (as opposed to occasionally or less) bilaterally handle, finger, and

feel—which is particularly important given the finding that plaintiff could perform her past

relevant work as a legal secretary and secretary that would involve typing and significant use of

her hands and fingers.

### D.    The ALJ Appropriately Considered Plaintiff's Work History[17]

Plaintiff also asserts that the ALJ failed to acknowledge or discuss her "stellar" work

history further compounding his erroneous "credibility assessment."  (Docket no. 21 at 20–21).

Plaintiff clarifies that she is not "suggesting that the credibility of work history carries more

weight than the other factors," but contends that "it cannot be reasonably denied that (1) the

Agency's rules require consideration of a claimant's historical willingness to work in the

credibility finding; and (2) that the ALJ in this case did not consider it."  (*Id.* at 21).

The Commissioner responds that the ALJ was not "entitled" to consider plaintiff's

"character" and that her work history was not a relevant factor in "'elevating' the 'truthfulness'

of her subjective complaints."  (Docket no. 24 at 29).  Interpreting plaintiff's argument as an

assertion that her subjective complaints should be given more credence because of her past work

history, the Commissioner contends that the ALJ was right not to make this "impermissible

character assessment" and refers to SSR 16-3p as support.  (*Id.*).  The Commissioner goes on to

assert that plaintiff has made no connection between her work history and functional limitations

but, in any case, the ALJ appropriately considered her past work in his decision.  (*Id.* at 29–30).

---

[17] Plaintiff includes this argument as part of her second challenge.  (*See* Docket no. 21 at 20).  The Commissioner treats this argument separately.  (*See* Docket no. 24 at 28).

In evaluating a claimant's subjective complaints, the ALJ must consider all the evidence presented "including information about [the claimant's] prior work record." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In this case, at the administrative hearing, the ALJ heard extensive testimony pertaining to plaintiff's work history (AR 94–114, 119, 130–33) and summarized her difficulties into limitations when questioning the vocational expert (*See, e.g.*, AR 141–42). In his decision, the ALJ referenced plaintiff's work history to include her most recent employment at L'Occitane and Sephora. (AR 24). He also referred to her work history when discussing the vocational expert's testimony and in reaching the conclusion that plaintiff could perform past relevant work as a legal secretary. (AR 28). The ALJ further discussed plaintiff's past work in order to determine which positions qualified as substantial gainful activity and which did not. (AR 21). While the ALJ could have more been more precise in his articulation of the role of plaintiff's work history in his evaluation of her subjective complaints, his references show that he did consider it as required by the regulations. The ALJ, therefore, appropriately considered plaintiff's work history.

## V. CONCLUSION

Based on the foregoing, the Commissioner's final decision denying benefits for the period of July 26, 2016 through the date of the ALJ's decision on January 31, 2019 must be remanded for further consideration. Accordingly, plaintiff's motion for summary judgment (Docket no. 20) is granted in part; the Commissioner's motion for summary judgment (Docket no. 23) is denied; and the final decision of the Commissioner is remanded.

Entered this 22nd day of September, 2020.

/s/

John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

56